## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## ST. THOMAS DIVISION

ARNOLD GOLDEN, on behalf of himself
and all others similarly situated,

                Plaintiff,

     vs.

POPULAR, INC.; BANCO POPULAR
DE PUERTO RICO; and POPULAR
BANK

                Defendants.

Civil Action No. ___3:20-cv-00095___

**CLASS ACTION**
**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Arnold Golden, on behalf of himself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding Plaintiff and on information and belief as to other allegations.

### INTRODUCTION

1.    Plaintiff brings this action on behalf of himself and classes of all similarly situated consumers against defendants Popular, Inc.; Banco Popular de Puerto Rico; and Popular Bank (collectively the "Bank" or "Defendants") arising from the Bank's routine practice of charging overdraft fees ("OD Fees") on transactions that do not overdraw a checking account.

2.    This practice breaches contractual promises; violates the covenant of good faith and fair dealing; results in the Bank being unjustly enriched; and violates the consumer protection law of the Virgin Islands.

3.     The Bank's customers have been injured by the Bank's improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with the Bank.

4.     On behalf of himself and the Class, Plaintiff seeks damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## PARTIES

5.     Arnold Golden is a resident of Durham, North Carolina and holds a checking account with the Bank that he opened in St. Thomas, Virgin Islands.

6.     Defendants Banco Popular de Puerto Rico and Popular Bank are engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Class.

7.     Defendant Popular, Inc. is the parent company of defendants Banco Popular de Puerto Rico and Popular Bank.   Defendants have approximately $44.3 billion in assets and provides banking services to customers through bank branches in Puerto Rico, the US Virgin Islands, New York, New Jersey, Florida, and elsewhere.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed classes are comprised of at least 100 members; (2) proposed class members reside in at least eight states, meaning at least one member of the proposed classes resides outside of the Virgin Islands; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction here and regularly conduct business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### THE BANK CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

#### A.  Overview of Claim

10.      Plaintiff brings this cause of action challenging the Bank's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

11.      Here is how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, the Bank immediately reduces accountholders' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds to cover these transactions because the Bank has already sequestered these funds for payment.

12.      However, the Bank still assesses crippling OD Fees on many of these transactions and misrepresents its practices in its account documents.

13.      Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, the Bank later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

14. The Bank maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, the Bank sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

15. That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

16. Still, despite keeping those held funds off-limits for other transactions, the Bank improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

17. Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found

deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

18.     There is no justification for these practices, other than to maximize the Bank's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But the Bank is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But the Bank was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

19.     Besides being unfair and unjust, these practices breach contract promises made in the Bank's adhesion contracts—contracts which fail to inform accountholders about the true nature of the Bank's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

20.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that the Bank will only charge OD Fees on transactions that have insufficient funds to cover that debit card transaction.

21.     In short, the Bank is not authorized by contract to charge OD Fees on transactions

that have not overdrawn an account, but it has done so and continues to do so.

### B. Mechanics of a Debit Card Transaction

22.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from the Bank. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to the Bank, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

23.     At this step, if the transaction is approved, the Bank immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

24.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

25.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

26.     The Bank (like all banks) decides whether to "pay" debit card transactions at authorization.  After that, the Bank is obligated to pay the transaction no matter what.  For debit

card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when the Bank may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

27.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### C. The Bank's Account Contract

28.     Plaintiff has a checking account with the Bank, which is governed by the Bank's standardized "Individual Deposits Account Agreement" ("Deposit Agreement"), Ex. A, and "Overdraft Disclosure," Ex. B.

29.     The Deposit Agreement expressly promises that it uses a consumer's "available funds" to determine when an overdraft occurs, and that overdrafts are determined when it chooses to "honor" transactions, which is the moment of authorization for debit card transactions:

> The Bank shall determine if an Account has available funds to honor an item at any time from the time of receipt of such item until the cut-off time established by the Bank to return the item. Only one determination of availability of funds will be made by the Bank. If upon such determination it appears that funds in the Account are insufficient to pay the item, the Bank is under no obligation to pay the item and may return it. The Bank is not required to send a notice prior to returning items for insufficient funds. 2. The Bank may, at its option, pay any payment order or item against the Account even if it creates an overdraft; provided, however, that the payment of one or several overdrafts shall not bind the Bank to pay subsequent overdrafts.

Ex. A.

30.     The Overdraft Disclosure, Ex. B, reiterates that an overdraft occurs when there are insufficient funds "to cover" a transaction and that an overdraft is determined when a Bank "authorizes and pays" a debit card transaction:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but the Bank chooses to pay it.
>
> […]
>
> Which are the standard overdraft practices that come with your account? The Bank **authorizes and pays** overdrafts, at its sole discretion, for the following transactions:
>
> • Checks and other transactions
> • Automatic bill payments preauthorized by you
>
> The Bank does not authorize, nor pays overdrafts for the following transactions unless you ask us:
>
> • ATM transactions
> • ATH debit card transactions
>
> Notwithstanding your consent and authorization for the payment of these overdrafts, the Bank will determine to pay an overdraft at its sole discretion, which means that the Bank does not guarantee that it will always authorize and pay any ATM transaction or ATH debit card transaction that causes an overdraft in your account. If the Bank does not **authorize and pay the overdraft**, your transaction will be declined.

31.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet BPPR assesses OD Fees on them anyway.

32.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions. APPSN transactions are always authorized at the time the customer swipes the debit card when there are sufficient available funds in the account.

33.     In fact, the Bank actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

34.     All the above representations and contractual promises are untrue. In fact, the Bank charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that the Bank may impose OD Fees on any APPSN Transactions.

35.     The account documents misconstrue the Bank's true debit card processing and overdraft practices.

36.     First, and most fundamentally, the Bank charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that the Bank will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

37.     The Bank assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds available to cover them throughout their lifecycle.

38.     The Bank's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between the Bank's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

39.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

40.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what the Bank does when it re-debits the account during a secret batch posting

process.

41.     In reality, the Bank's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

42.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, the Bank cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

43.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, the Bank does something new and unexpected, during its nightly batch posting process. Specifically, the Bank releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

44.     This secret step allows the Bank to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which BPPR specifically set aside money to pay them.

45.     This discrepancy between the Bank's actual practices and the contract causes accountholders to incur more OD Fees than they should.

46.     In sum, there is a huge gap between practices as described in the account documents and the Bank's practices in reality.

### D.  The Bank Abuses Contractual Discretion

47.     The Bank's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, the Bank exploits

contractual discretion to the detriment of accountholders when it uses these policies.

48.     The term "hold" is interpreted by the Bank in a surprising, counterintuitive way. the Bank uses its discretion to define this term in a manner contrary to any reasonable, common sense understanding of that term.

49.     Moreover, the Bank uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

50.     The Bank uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

### E.   Reasonable Accountholders Understand Debit Card Transactions are Debited Immediately

51.     The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

52.     The Bank was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

53.     The Bank knows that many accountholders prefer debit cards for these very reasons. Research indicates that accountholders prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

54.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is

11

no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?* ConsumerAction (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card.

55.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full."   *Understanding Debit Cards*, ConsumerAction, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited August 29, 2019).

56.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

57.     Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

58.     The Bank was aware of a accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its

12

account agreement only supports this perception.

### F.  Plaintiff's Debit Card Transactions

59.     As examples, on January 22, 2019, April 17, 2019, May 29, 2019, July 17, 2019, and September 16, 2019, Plaintiff was assessed OD Fees in the amount of $15.00 each for debit card transactions that settled on those days, despite the fact that positive funds were immediately deducted prior to those days, when the transactions were authorized.

### CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action on behalf of himself and on behalf of all others similarly situated pursuant to Federal Rule 23.  The Class includes:

> All persons in the United States who, within the applicable statute of limitations period, were charged OD Fees on debit card transactions that did not overdraw a checking account with any of the Defendants.

61.     Plaintiff also bring this action on behalf of himself and a subclass of persons defined as the following (and referred to herein as "The U.S. Virgin Islands Subclass"):

> All persons in the United States Virgin Islands who, within the applicable statute of limitations period, were charged OD Fees on debit card transactions that did not overdraw a checking account with any of the Defendants.

62.     Excluded from the Class are Defendants, Defendants' subsidiaries and affiliates, their officers, directors, and the members of their immediate families, and any entity in which Defendants have a controlling interest, the legal representatives, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

63.     Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add subclasses if necessary before this Court determines whether certification is appropriate.

64.     The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because the Bank has acted on grounds generally applicable to the Class.  Such common legal or factual questions include, but are not limited to:

a)     Whether the Bank improperly charged OD Fees;

b)     Whether any of the conduct enumerated above violates the contract;

c)     Whether any of the conduct enumerated above violates the covenant of good faith and fair dealing;

d)     The appropriate measure of damages.

65.     The parties are numerous such that joinder is impracticable.  Upon information and belief, and subject to class discovery, the Class consist of thousands of members or more, the identities of whom are within the exclusive knowledge of and can be ascertained only by resort to the Bank's records.  The Bank has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

66.     It is impracticable to bring members' of the Class individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.  The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

14

67.     Plaintiff's claims are typical of the claims of the other members of the Class in that they arise out of the same wrongful business practices by the Bank, as described herein.

68.     Plaintiff is more than an adequate representative of the Class in that Plaintiff has a checking account with the Bank and has suffered damages as a result of the Bank's contract violations, The Bank's violations of the covenant of good faith and fair dealing, and the Bank's unjust enrichment.  In addition:

a)      Plaintiff is committed to the vigorous prosecution of this action on behalf of himself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b)      There is no conflict of interest between Plaintiff and the unnamed members of the Class;

c)      Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d)      Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

69.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

70.     The Bank has acted or refused to act on grounds generally applicable to each of the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each of the Class as a whole.

71.     All conditions precedent to bringing this action have been satisfied and/or waived.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (On Behalf of Plaintiff and the Class)

72. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

73. Plaintiff and the Bank contracted for checking account services, as embodied in the Deposit Agreement and Overdraft Disclosure.

74. The Bank breached the terms of the contract.

75. Plaintiff and members of the putative Class have performed all of the obligations on them pursuant to the Bank's agreements.

76. Plaintiff and members of the putative Class have sustained monetary damages as a result of each of Defendant's breaches.

### COUNT II
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiff and the Class)

77. Plaintiff repeats, realleges, and incorporates by reference the above paragraphs as if fully set forth herein.

78. Plaintiff and the Bank contracted for checking account services, as embodied in the Deposit Agreement and Overdraft Disclosure.

79. The Virgin Islands mandates that an implied covenant of good faith and fair dealing govern every contract. For banking transactions, this is also mandated by the Uniform Commercial Code that has been adopted in each state. The covenant of good faith and fair dealing constrains Defendants' discretion to abuse self-granted contractual powers.

80. This good faith requirement extends to the manner in which a party employs

16

discretion conferred by a contract.

81.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

82.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

83.     The Bank breached the covenant of good faith and fair dealing as explained herein.

84.     Each of Defendants' actions was done in bad faith and was arbitrary and capricious.

85.     Plaintiff and members of the putative Class have performed all of the obligations imposed on them pursuant to the Deposit Agreement.

86.     Plaintiff and members of the putative Class have sustained monetary damages as a result of each of Defendant's breaches of the covenant of good faith and fair dealing.

## COUNT III
## UNJUST ENRICHMENT
### (On Behalf of the Class)

87.     Plaintiff incorporates by references all preceding paragraphs.

Defendants obtained benefits and monies because the Bank improperly charged OD Fees, to the detriment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## COUNT IV
## VIOLATION OF UNFAIR AND DECEPTIVE TRADE PRACTICES
## UNDER U.S. VIRGIN ISLAND LAW
**Consumer Protection Law of 1973 – Unfair Trade Practices 12A V.I.C. § 101, et. seq. 67.**
**(On Behalf of Plaintiff and the U.S. Virgin Island Subclass)**

88.     Plaintiff repeats, realleges, and incorporates by reference the above paragraphs as if fully set forth herein.

89.     The purpose of the Consumer Protection Law is to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of trade or commerce.

90.      Defendants engaged and continue to engage in a deceptive and unconscionable trade practice regarding its OD fees.

91.     Defendants' deceptive and unconscionable trade practices have the tendency and effect of deceiving or misleading consumers, including Plaintiff.

92.     Defendants' misrepresentation of material facts and failure to state material facts has deceived Plaintiffs in their role as consumers.

93.     Defendants' wrongful actions represent an unconscionable trade practice in that defendants unfairly took advantage of the lack of knowledge, ability, experience, mathematical ability, or capacity of consumers when concealing, misrepresenting, and failing to make known its practice regarding OD Fees.

94.     Plaintiff pleads the provision of the statute regarding an award of punitive damages.

95.      Each defendant is jointly and severally liable for the torts alleged herein.

## COUNT V
## VIOLATION OF UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER VIRGIN ISLANDS LAW
**The Consumer Fraud and Deceptive Business Practices Act 12A V.I.C. § 301, et seq. 74.**
**(On Behalf of the U.S. Virgin Islands Subclass)**

96.     Plaintiff repeats, realleges, and incorporates by reference the above paragraphs as

if fully set forth herein.

97.     The purpose the Consumer Fraud and Deceptive Business Practices Act is to protect the consuming public from those who engage in deceptive and unfair acts in the course of trade or commerce.

98.     Defendants engaged in deceptive business practices by charging consumers OD Fees.

99.     Plaintiff pleads the provision of the statute regarding an award of attorneys' fees.

100.    Plaintiff pleads the provision of the statute regarding an award of punitive damages.

101.    Each defendant is jointly and severally liable for the torts alleged herein.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A.     Certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23, appointing the Plaintiff as representative of the Class, and appointing counsel for Plaintiff as lead counsel for the respective Class;

B.     Declaring that Defendants' policies and practices as described herein constitute a breach of contract and a breach of the covenant of good faith and fair dealing or unjust enrichment;

C.     Enjoining Defendants from the wrongful conduct as described herein;

D.     Awarding restitution of all fees at issue paid to Defendants by Plaintiff and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

E.     Compelling disgorgement of the ill-gotten gains derived by Defendants from the Bank's misconduct;

F.      Awarding actual and/or compensatory damages in an amount according to proof and punitive damages;

G.      Awarding pre-judgment interest at the maximum rate permitted by applicable law;

H.      Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

I.      Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this

Class Action Complaint that are so triable.

Respectfully submitted,

**BURNS CHAREST LLP**

Dated:  October 1, 2020         BY:    */s/ Korey A. Nelson*
                                       Korey A. Nelson
                                       V.I. Bar No. 2012
                                       365 Canal Street, Suite 1170
                                       New Orleans, LA 70130
                                       Telephone: (504) 799-2845
                                       Facsimile: (504) 881-1765
                                       knelson@burnscharest.com

                                       */s/ Michael R. Reese*
                                       **REESE LLP**
                                       Michael R. Reese (*pro hac vice* to be applied for)
                                       *mreese@reesellp.com*
                                       100 West 93rd Street, 16th Floor
                                       New York, New York 10025
                                       Telephone: (212) 643-0500
                                       Facsimile: (212) 253-4272

                                       */s/ Spencer Sheehan*
                                       **SHEEHAN & ASSOCIATES, P.C.**
                                       Spencer Sheehan (*pro hac vice* to be applied for)
                                       *spencer@spencersheehan.com*
                                       505 Northern Boulevard, Suite 311
                                       Great Neck, New York 11021
                                       Telephone: (516) 303-0552
                                       Facsimile:  (516) 234-7800

                                       */s/ Jeffrey Kaliel*
                                       **KALIEL PLLC**
                                       Jeffrey Kaliel (*pro hac vice* to be applied for)
                                       *jkaliel@kalielpllc.com*
                                       1875 Connecticut Avenue NW, 10th Floor
                                       Washington, DC 20009
                                       Telephone: (202) 150-4783

                                       *Counsel for Plaintiff and the Proposed Class*